UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DEREK SAIDAK,                          )
                                       )
              Plaintiff,               )
                                       )
v.                                     )          No. 3:19-CV-487-JPM-DCP
                                       )
MICHAEL SCHMIDT and TRUMPET OF THE     )
LORD,                                  )
                                       )
              Defendants.              )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court,

and the referral Order [Doc. 38] of the District Judge.

Now before the Court is Plaintiff's First Motion for Preliminary Injunction [Doc. 36]

Plaintiff's Supplemental Motion for Preliminary Injunction [Doc. 39], and Defendant's Motion

Con[t]esting Preliminary Injunction [Doc. 42].[1]  The Court held evidentiary hearings on these

Motions via videoconference on July 24, 2020, and August 13, 2020.  Attorneys Christopher

Martin and Raymond Stephens appeared on behalf of Plaintiff.  Defendant Michael Schmidt

appeared pro se.[2]  The Court permitted post-hearing briefs, which were filed on September 4, 2020,

---

[1] The Court notes that while Defendant filed a Motion Con[t]esting Preliminary Injunction
[Doc. 42], his filing appears to be a response to Plaintiff's Motions [Docs. 36, 39], and it will be
construed as such.

[2] The Court notes that in Plaintiff's filings, he requests a preliminary injunction against
Defendant Schmidt and then later requests a preliminary injunction against Defendants.  During
the July 24 hearing, Defendant Schmidt stated that Trumpet of the Lord is inactive and has no
assets.  Plaintiff stated that Trumpet of the Lord is not involved and is unrepresented.  Thus, the
Court will not consider Plaintiff's request as it pertains to the Trumpet of the Lord.  Unless
otherwise noted, references to Defendant are to Defendant Schmidt and references to Defendants
are to both Defendant Schmidt and Defendant Trumpet of the Lord.

by Plaintiff [Doc. 62] and September 8, 2020, by Defendant [Doc. 63].[3]

During the evidentiary hearings, Plaintiff presented the testimony of Rochelle Pettus and himself. Defendant presented the testimony of Roderick Purvis, Dan Alex Payne, Patricia Schmidt, and himself. The Court has considered the filings in this case and the evidence presented at the hearings on July 23 and August 13, 2020. Accordingly, for the reasons explained below, the Court **RECOMMENDS** that Plaintiffs' Motions requesting a preliminary injunction [**Docs. 36, 39**] be **DENIED**.[4]

## I.      BACKGROUND

The Complaint [Doc. 1] in this matter was filed on November 27, 2019. The Complaint states that Plaintiff formed a business venture in 2012 under the name "Legends Brass," designing mouthpieces for trumpets and other brass wind instruments. [*Id.* at ¶ 9]. Plaintiff entered into a manufacturing agreement with Pickett Brass to manufacture the mouthpieces that Plaintiff designed. [*Id.*]. The Complaint states that Plaintiff later met Defendant, an avid trumpet player, who became interested in Legends Brass's products. [*Id.*]. Defendant expressed an interest in a custom mouthpiece, which Plaintiff designed and produced through Pickett Brass. [*Id.*]. As homage to Defendant, Plaintiff labeled the mouthpiece the "Outlaw." [*Id.* at ¶ 10]. In addition, as further homage to Defendant, Plaintiff mentioned Defendant on Legends Brass's website. [*Id.*].

---

[3] The Court further notes that while Defendant's post-hearing brief is titled "Motion to Deny the Preliminary Injunction" [Doc. 63], it will be construed only as his post-hearing brief. As pointed out by Plaintiff in his Reply [Doc. 64], Defendants have filed multiple Motions to Dismiss, and this case is currently stayed pending resolution of Plaintiff's instant Motion for Preliminary Injunction [Doc. 38].

[4] As noted in footnote 1 *supra*, Defendant's Motion Con[t]esting Preliminary Injunction [Doc. 42] will be construed as a response to Plaintiffs' Motions [Doc. 36, 39] and the Clerk's Office will be directed to correct the docket entry for [Doc. 42].

2

The Complaint states, however, that Defendant did not design the Outlaw mouthpiece, or any other mouthpieces that were sold by Legends Brass and manufactured by Pickett Brass. [*Id.*].

The Complaint states that Defendant became embroiled in a series of social media controversies involving third parties not related to Plaintiff or Legends Brass. [*Id.* at ¶ 11]. As a result, however, Plaintiff dropped all references to Defendant on the Legends Brass website and on all promotional advertising for Legends Brass. [*Id.*]. The Complaint alleges that Defendant became upset at his omission on the Legends Brass website and its promotional advertising. [*Id.*].

The Complaint avers that Defendant began a calculated campaign to defame, slander, and libel Plaintiff and Legends Brass. [*Id.* at ¶ 12]. The Complaint states that Defendants posted numerous articles and defamatory remarks regarding Plaintiff and Legends Brass on social media, including on websites maintained by Defendants under the name, "Trumpet of the Lord." [*Id.*]. Specifically, the Complaint alleges that Defendant repeatedly labeled Plaintiff as a "dishonest crook" and stated that Plaintiff did not design any Outlaw mouthpieces "in any way." [*Id.*]. In addition, Defendant accused Plaintiff of stealing Defendants' intellectual property and also accused Plaintiff of unethical behavior. [*Id.*]. Further, Defendant made repeated demands for the removal of the Outlaw mouthpiece from Legends Brass's internet catalogue and all advertising and further demanded that Plaintiff and Legends Brass cease and desist from selling the Outlaw and other mouthpieces. [*Id.*].

The Complaint further alleges that in September 2019, a picture of Plaintiff was posted on the Trumpet of the Lord's website,[5] along with a post contending that Plaintiff lied about

---

[5] The Complaint alleges that Trumpet of the Lord is a not for profit business association [Doc. 1 at 1]. At the August 13, 2020 hearing, Defendant stated, "the Trumpet of the Lord is now defunct" [Doc. 61 at 76].

Defendant and that the Legends Brass website contained several lies. [*Id.* at ¶ 13]. In addition, the Complaint states that Defendant made repeated telephone calls to numerous employees at the ORNL Federal Credit Union ("ORNL"), where Plaintiff serves as the Chief Lending Officer. [*Id.* at ¶ 14]. During his contacts with ORNL employees, Defendant made false accusations that Plaintiff was a dishonest crook and that Plaintiff and Legends Brass stole Defendant's intellectual property. [*Id.*].

In addition, the Complaint alleges that Defendant contacted Dr. C.E. (Jack) Johnson, III, the Senior Pastor of the First Baptist Church of Lenoir City ("Church"), and other members of the Church, claiming that Plaintiff was dishonest and that Plaintiff lied about Defendant. [*Id.* at ¶ 15]. The Complaint further alleges that Defendant published false statements and allegations to Pickett Brass. [*Id.* at ¶ 16].[6] The Complaint avers that Defendant included Pickett Brass in his social media postings relating to Plaintiff and Legends Brass and that Defendant asked readers to call Pickett Brass and complain about Plaintiff and Legends Brass. [*Id.*]. The Complaint alleges that Plaintiff and Legends Brass "have and are likely to suffer personal injury directly traceable to [Defendant] Schmidt's false statements and allegations . . . ." [*Id.* at ¶ 17].

With respect to the above allegations, the Complaint alleges defamation and intentional interference with business relationships. [*Id.* at 7–8]. In addition, the Complaint requests a declaratory judgment that Defendants hold no trademarks or intellectual property rights with respect to the Outlaw. [*Id.* at 8–10]. Finally, the Complaint alleges violations of the Lanham Act, 15 U.S.C. § 43. [*Id.* at 11–13].

_____

[6] The Court notes that in earlier paragraphs of the Complaint, Plaintiff refers to the manufacturer as "Pickett Brass," but in later paragraphs of the Complaint, Plaintiff refers to the manufacturer as "Picketts Brass." The Court will reference the manufacturer as "Pickett Brass."

4

Defendants filed an Answer and Counterclaim [Doc. 18], asserting breach of contract, slander and libel, and unlawful seizure of intellectual property.[7]

## II. EVIDENCE

As mentioned above, during the evidentiary hearings, Plaintiff presented the testimony of Rochelle Pettus and himself. Defendant presented the testimony of Roderick Purvis, Dan Alex Payne, Patricia Schmidt, and himself.

The Court will now summarize the testimony presented at the hearings.

### A. Testimony of Rochelle Pettus

Rochelle Pettus ("Pettus") testified that she had been employed at ORNL for almost thirty (30) years. Currently, she is the Vice President of Call Centers Operations. She testified that Defendant is not eligible for membership at ORNL and that he has never been an ORNL member. Pettus testified that she has access to ORNL's call center records and that she has reviewed such records to determine whether Defendant has contacted ORNL. Specifically, Pettus testified that Exhibit 1 is an accurate transcript of Defendant's chat session with Karen Brown ("Brown"), a chat agent at ORNL's Call Center Services.[8]

In relevant part, Exhibit 1 shows that Defendant contacted ORNL's call center and stated that Plaintiff was bullying and mocking him on Plaintiff's website by calling Defendant "Howdy Ho." During the chat session, Defendant explains that a "'Howdy Ho' referrs [sic] to a piece of sh*t that is flushed down the commode." [Ex. 1]. Defendant stated that he needed ORNL to get Plaintiff to stop harassing and suing him. Defendant states as follows:

---

[7] The Court notes that when Defendants filed their Answer and Counterclaim [Doc. 18], they were represented by counsel, Attorney Jeffrey Sliz. Attorney Sliz was permitted to withdraw from this matter on May 19, 2020. [Doc. 38].

[8] Exhibit 1 was filed in CM/ECF as [Doc. 48-1 at 12–14].

5

> Your VP is lying about me[,] and I have proof. I am about to take all of this to the press. Do you want OTNL [sic] Federal Credit Union known for having aN EMPLOYEE WHO IS SUING AND HARASSING A COMPLETELY DISABLED PERSON? . . . I am going to the press on Friday unless you get him to drop the lawsuit that he has against me by Friday at noon.

[*Id.*] (Emphasis in original). Defendant then requests the number to ORNL's personnel department, which Brown provides. [*Id.*].

Pettus testified that she reviewed records for other contacts by Defendant and that all the contacts Defendant made to ORNL were not related to ORNL business. She testified that she has known Plaintiff for five (5) years and that these contacts have not been good for Plaintiff.

On cross examination, Pettus testified that Defendant did not represent that he was ORNL's customer and that he stated that he needed the personnel department's telephone number in order to make a complaint.

### B. Testimony of Plaintiff

Plaintiff testified that he is currently employed at ORNL as the Senior Vice President Chief Lending Officer. He has been employed at ORNL for about five-and-a-half years.

Plaintiff stated that he owns Legends Brass as a sole proprietorship and that he does not manufacture any material. Plaintiff stated that Legends Brass is maintained by his wife, Leslie Saidak, while he works. As part of the sole proprietorship, Plaintiff develops mouthpieces for brass wind instruments, primarily for trumpets, and that 90% of his business is selling mouthpieces. The other 10% is buying and selling trumpets. Plaintiff testified that there are many components involved in making mouthpieces and that he became interested in the technology of how to make them.

Plaintiff testified that prior to starting his sole proprietorship, he communicated with Defendant about buying and selling trumpets. He also had discussions with Defendant about

6

designing and making mouthpieces because Defendant was familiar with Pickett Brass. Plaintiff testified that he created and designed the Outlaw. Plaintiff stated that he and Defendant discussed designs of mouthpieces and that Defendant penciled a drawing of what he (Defendant) thought the mouthpiece should look. Plaintiff testified that Defendant's drawing was useless because the degree of measurements (i.e., a thousandths of an inch) needed in creating a mouthpiece. Plaintiff testified that he sent Defendant his (Plaintiff's) first version of the mouthpiece and that Defendant liked it. Plaintiff stated that Defendant suggested changes to the mouthpiece, but Plaintiff did not incorporate Defendant's suggestions into the design. Plaintiff testified that Defendant endorsed the Outlaw and that Plaintiff wanted Defendant's endorsement because Defendant had played the trumpet for a long time.

Plaintiff stated that about eighteen (18) months ago, he was contacted by several people whom Defendant was attacking on social media. Plaintiff stated that he looked at Defendant's social media posts and told Defendant that if he did not stop making such posts, Plaintiff would drop Defendant as a contact. Plaintiff stated that he decided to remove Defendant from Plaintiff's website given Defendant's behavior on social media. In addition, Plaintiff stated that he and his wife prepared a press release [Ex. 2] after learning that Defendant began making personal attacks against Plaintiff on several websites.[9] The press release states, in relevant part, that there is no connection between Legends Brass and Defendant and that the parties have shared ideas about designs for trumpet mouthpieces, but Defendant "never participated in any way in the actual process of designing, manufacturing, testing of prototypes, financial investing in inventory,

---

[9] Exhibit 2 was filed in CM/ECF as [Doc. 42-1 at 1].

photographing, advertising, or selling the mouthpieces." [*Id.*].  The press release further states that the work has been done solely by Plaintiff.  [*Id.*].

Plaintiff testified that after he and his wife submitted the press release, Defendant left several inappropriate voicemails on Plaintiff's cell phone.[10]  In one voicemail left in September 2019, Defendant stated that the press release was a lie and that he would not stop calling Plaintiff's Church or his workplace.  Defendant stated that Plaintiff was dishonest and that Plaintiff never paid Defendant a penny that Plaintiff made on the Outlaw.  In another voicemail that Defendant left on Plaintiff's cell phone, Defendant stated that he was going to start flooding the trumpet discussion groups with posts about the Outlaw being Defendant's design.  Defendant also stated that he was going to contact Pickett Brass and threaten it with a lawsuit if it continued to manufacture the Outlaw.  In the voicemail, Defendant calls Plaintiff a liar and states that Plaintiff will lose in court.

Plaintiff testified that Defendant has continued to post on social media about Plaintiff and that he also contacted Plaintiff's Church and ORNL.  As a result of Defendant's contacts with the Church and ORNL, Plaintiff testified that the Church and ORNL "beefed up security."  Plaintiff testified that Defendant has also contacted Pickett Brass.  Plaintiff stated that Defendant has referred to Plaintiff as a liar, thief, and a criminal and crook and has called him dishonest.

Plaintiff testified that Defendant's actions have caused issues at ORNL.  Plaintiff testified that he had to meet with his immediate supervisor and the Board of Directors regarding the matter and that ORNL had to inform all of the branches and about 150 employees of the situation for security issues.  Plaintiff states that his career demands high standards and character and that searching his name in Google shows Defendant's posts about Plaintiff being a liar.  Plaintiff stated

_____

[10] Plaintiff played two voicemails left by Defendant.

8

that the next stop in his career is to be the Chief Credit Officer, but people will be able to read all the defamatory statements Defendant has posted.

Plaintiff also testified that Defendant's actions have impacted his relationship with his Church. Plaintiff explained that he serves as a trustee and a deacon at the Church and that he cannot have such allegations against him while serving in these roles. Plaintiff stated that with respect to his relationship with Pickett Brass, the owner told Plaintiff that he will not manufacture the mouthpieces until the situation between Plaintiff and Defendant resolves. Plaintiff stated that Defendant's actions have impacted his business and that he saw a dramatic decrease in sales from October to November.

Plaintiff testified that Exhibit 3 is a social media post by Defendant dated June 6, 2020, wherein Defendant refers to Plaintiff as "ORNL Federal Credit Union Vice President Derek Saidak" and discusses how Plaintiff lies about manufacturing a mouthpiece called the "Howdy Ho." [Ex. 3].[11] [12] In the post, Defendant states, "You have now seen the proof here that Lenoir City, Tennessee First Baptist Church Music Ministry Member Derek Saidak is lying about me, humiliating, maltreating, abusing and psychologically torturing and tormenting me." [Id.]. Defendant publishes Plaintiff's and Plaintiff's Church telephone numbers and urges readers to call those numbers and demand that the lawsuit be dropped. [Id.]. He also requests that readers contact ORNL and file a formal complaint in an attempt to get Plaintiff to drop the lawsuit. [Id.].

Plaintiff explained that the reference to "Howdy Ho" is a character, a piece of excrement, from South Park, a television show. Plaintiff stated that Defendant refers to himself as "Howdy,"

---

[11] Exhibit 3 was filed in CM/ECF as [Doc. 39-1 at 3].

[12] The Court notes that during much of Plaintiff's testimony about Exhibit 3, Defendant appeared to leave the room. It is not clear if Defendant heard this testimony.

so several people who were attacked by Defendant on social media created a Facebook group called "Howdy Ho," referencing Defendant in relation to the South Park character. Plaintiff states that he is a member of this Facebook group, but he had never watched South Park, and he did not know that the Facebook group was created as a reference to the character on South Park. Plaintiff stated that earlier, he had intended to make a "Howdy Ho" mouthpiece in reference to the Facebook group, but later, he realized that the Facebook group was calling Defendant, "Howdy Ho," in reference to the South Park character.

Plaintiff testified that Defendant also posted about Plaintiff on the website, "Atlanta CV Drum and Bugle Corps." [Ex. 4].[13] Defendant's post is dated June 5, 2020. [*Id.*]. The post refers to Plaintiff as a "liar" and refers to the instant matter as a "liesuit." [*Id.*]. Defendant also states in his post that Plaintiff, the ORNL employee, lied when he said that Defendant did not design the Outlaw or any other mouthpiece. [*Id.*]. Defendant further declares in the post that Plaintiff's first eBay advertisement states that the Outlaw was co-designed by Defendant. [*Id.*]. Defendant urges readers to contact ORNL and Plaintiff's Church in order to stop Plaintiff from lying. [*Id.*]. Further, he refers to Plaintiff as a "crooked liar." [*Id.*]. In another post, Defendant states as follows:

> Here is one thing that you can do, [sic] you can come to my Facebook page where I will be sharing one of ORNL Federal Credit Unions Vice President of Member Businesses each day until Derek Saidak drops his Saidak Vs, Schmidt lawsuit against me. I know that Derek Saidak has lied about it, and now I am going to allow all of you to watch Derek Saidak's reputation self destruct by just quoting him in his own words like I have today, and like I did yesterday. So please stay tuned because Derek Saidak or ORNL Federal Credit Union has told a lot of lies about me, perjuring himself in his lawsuit against me, and he has also lied about me on his website and on social media. I wonder what ORNL Federal Credit Union will do about Derek Saidak the more of his lies that I post on here. One more thing Lyn Marie, you or anyone else are

---

[13] Exhibit 4 was filed in CM/ECF as [Doc. 39-1 at 8].

> free to come here and see all of this evidence, screenshots of Derek
> Saidak's lies in person for yourself. I am not making any of this up,
> and I have screen shot proof of all of it.

[Ex. 5].[14]

Plaintiff further testified about other postings by Defendant. For instance, in another post dated June 5, 2020, Defendant states that Plaintiff "again proves that he is a dishonest Christian when he lied to the court (#9) when [Plaintiff] said, '[Plaintiff] formed a business venture (www.legendsbrass.com) in 2012, . . . [Plaintiff] later met the defendant (Dr. Michael Schmidt . . .'"). [Ex. 6].[15] Defendant states that Plaintiff lied and he wonders if ORNL or Plaintiff's Church cares that Plaintiff has perjured himself. [*Id.*]. In another post dated the same day, June 5, 2020, Defendant asks the group, "Parkview High School Christian Men (Lilburn, GA)," to please contact him. [Ex. 7].[16] Defendant discusses the lawsuit and states that Plaintiff's lawsuit "is filled with one lie after another." [*Id.*]. Defendant states that "Outlaw" refers to him and that he and Plaintiff had an oral contract wherein Defendant would design trumpet mouthpieces and Plaintiff would give Defendant the credit. [*Id.*]. Defendant claims that Plaintiff's press release contains libelous statements, and he accuses Plaintiff of taking his original ideas. [*Id.*]. Defendant then discusses Plaintiff's job and his finances. [Ex. 8].[17]

---

[14] Exhibit 5 was filed in CM/ECF as [Doc. 39-1 at 11].

[15] Exhibit 6 was filed in CM/ECF as [Doc. 39-1 at 12].

[16] Exhibit 7 was filed in CM/ECF as [Doc. 39-1 at 13].

[17] Exhibit 8 is a continuation of Exhibit 7. Exhibit 8 was filed in CM/ECF as [Doc. 39-1 at 14].

11

Defendant wrote another post on June 5, 2020, stating that Plaintiff is a "dishonest Christian," alleging that Plaintiff lied to the Court. [Ex. 9].[18] On the following day, Defendant wrote a post, urging readers to contact Plaintiff's Church and ORNL to complain about Plaintiff's lawsuit against Defendant. [Ex. 10].[19] He urges readers to have ORNL's personnel department investigate Plaintiff for Plaintiff's intention on making a "Howdy Ho" mouthpiece. [*Id.*]. Defendant made a similar post on June 23, 2020. [Ex. 11].[20]

On cross examination, Plaintiff testified that he met Defendant in person after Plaintiff started his business, Legends Brass. Plaintiff acknowledged that Defendant never referred to him (Plaintiff) as a "criminal." Plaintiff testified that he did not hear Defendant make threats about physically harming ORNL or Plaintiff's Church.

Plaintiff testified that in his peak season, which is August through November, he typically sells between sixty (60) to sixty-five (65) mouthpieces per month. This past season, Plaintiff sold forty (40) to forty-five (45) mouthpieces per month. Plaintiff stated that the mouthpieces are about $35 each. Plaintiff denied mocking Defendant by calling him "Howdy Ho." Plaintiff testified that he intended to make a "Howdy Ho" mouthpiece in reference to the Facebook group.

Plaintiff stated that when advertising the Outlaw, he does not remember using the word, "co-design." Plaintiff testified that he referenced Defendant on his (Plaintiff's) website out of courtesy. Plaintiff testified that he sent Defendant the Outlaw when it was a final product and not as a prototype. Further, Plaintiff acknowledged that he created a post on Yelp regarding

---

[18] Exhibit 9 was filed in CM/ECF as [Doc. 39-1 at 15].

[19] Exhibit 10 was filed in CM/ECF as [Doc. 39-1 at 19].

[20] Exhibit 11 was filed in CM/ECF as [Doc. 48-1 at 3-4].

Defendant's business. In Plaintiff's post, he discussed his experience with Defendant. Plaintiff acknowledged that he was never Defendant's client.

Further, during cross examination, Plaintiff testified that on his website, he stated that the Outlaw was "designed in conjunction with" Defendant. Plaintiff stated that he used the phrase, "designed in conjunction with" out of courtesy because he was trying to be nice to Defendant. Plaintiff admitted that he lied on his website when he stated that the Outlaw was "designed in conjunction with" Defendant because Defendant was not involved in the design. Plaintiff stated that he sent the Outlaw to Defendant, who tested it and liked it. Plaintiff maintained that Defendant did not design the rim thickness, contour, or the shoulder of the Outlaw. Plaintiff stated that Defendant sent him a drawing of a mouthpiece, but Plaintiff threw it away.

Plaintiff testified that about twenty (20) to (25) people contacted him within a month or two, alleging that Defendant acted inappropriately on social media. Plaintiff stated that the people who contacted him shared with him Defendant's social posts and requested that Plaintiff "drop" Defendant. Plaintiff testified that he removed the reference to Defendant on his website given Defendant's actions on social media. Plaintiff testified that Defendant left several voicemails on his telephone and that Plaintiff removed the reference to Defendant on his website in March or April of last year. Plaintiff stated that Defendant was originally unaware that Plaintiff was going to reference Defendant on the website.

Plaintiff stated that he did not direct the secretaries at his Church to decline Defendant's telephone calls. Plaintiff testified that Defendant contacted the Church several times, and then afterwards, the Church reached out to Plaintiff, and Plaintiff told the Church about the situation between the parties. Plaintiff believes that the decline in sales with respect to his mouthpieces is due to Defendant's actions against Plaintiff.

### C.  Testimony of Roderick Purvis

Roderick Purvis ("Purvis") testified that he has experience in marching band and drum core international as an instructor.  Purvis testified that he went to Defendant's house a number of years ago, where Defendant stated that he was proud of the Outlaw that he designed.  Purvis stated that Defendant showed him the Outlaw on Plaintiff's website.  Purvis testified that Defendant is a great trumpet player, which is why he designed the Outlaw.[21]  Purvis testified that Defendant had been the target of vile behavior online by individuals involved in the drum core international group and that these individuals sought to ruin Defendant's business associations.  Purvis testified that it was his understanding that the instant lawsuit was constructed by the people who despise Defendant.

Purvis testified that he did not read Plaintiff's first eBay advertisement with respect to the Outlaw.  Purvis testified that he did see a mouthpiece on Plaintiff's website, which stated that it was designed by Defendant.  Purvis does not believe the reference to Defendant is still on Plaintiff's website.

On cross examination, Purvis stated that he never saw any of Defendant's drawings of the Outlaw.  In addition, Purvis did not see any specifications for the Outlaw.  Purvis stated that he and Defendant just talked about how the Outlaw was designed and how it was similar to other mouthpieces.

### D.  Testimony of Dan Alex Payne

Dan Alex Payne ("Dr. Payne") testified that from his understanding, Plaintiff and Defendant were in business together and that they designed a mouthpiece together.  Dr. Payne

---

[21] The Court notes that at this time, Plaintiff made a continuing objection to Purvis's testimony given that Defendant continued to ask Purvis's opinion on matters as opposed to factual questions and continued to ask leading questions.  The Court has summarized Purvis's testimony to the extent it is relevant to the issues in this case.

stated that Defendant decided to help Plaintiff design a mouthpiece. In addition, Dr. Payne stated that Defendant has been called the "Outlaw" since the 1990s or early 2000s. Dr. Payne stated that in 2005, Defendant promoted his ministry on a website and called himself, "Outlaw," for a fundraiser. Dr. Payne stated that he recalls discussing the Outlaw with Defendant and that Defendant wanted to sell the Outlaw on the Trumpet of the Lord's website to raise funds for the ministry.

On cross examination, Dr. Payne testified that he never met or spoke to Plaintiff. He stated he has learned everything he knows about the parties' relationship from Defendant. Dr. Payne stated that he has never read a partnership agreement between the parties. Dr. Payne testified that he inferred the parties had a relationship because Plaintiff sold the Outlaw and Defendant designed it. Dr. Payne stated that he saw pictures of the Outlaw and that he may have seen some drawings of the Outlaw, but he cannot recall. He testified that he does not know what specifications mean because he does not play the trumpet. Dr. Payne testified that he disassociated himself with Defendant.

### E.    Testimony of Patricia Schmidt

Patricia Schmidt ("Ms. Schmidt"), Defendant's wife, testified that she is a detention officer in Fulton County, Georgia. Ms. Schmidt testified that Plaintiff did not design the Outlaw and that Defendant designed the Outlaw. She stated that the Outlaw was based on another mouthpiece called Bob Reeves. Ms. Schmidt testified that she saw the designs that Defendant created and that she put the designs in the mail to send to Plaintiff.

Ms. Schmidt further testified that she overheard the parties' conversations several times because her husband likes to talk on speaker phone. Ms. Schmidt states that they agreed to send the Outlaw to Pickett Brass to manufacture. She testified that she also sent Plaintiff a Bob Reeves

15

mouthpiece. She stated that Plaintiff sent Defendant the Outlaw for Defendant to look at it. Defendant sent it back to Plaintiff and agreed to "go ahead." Ms. Schmidt stated that Defendant did notice one small change on the Outlaw that Plaintiff sent with respect to the size of the cup, but Defendant sent the Outlaw back to Plaintiff despite the change. She believes the only part Plaintiff designed was the lead pipe, but Defendant designed the remaining parts of the Outlaw. She testified that Plaintiff and Defendant never discussed money.

Ms. Schmidt testified that for seven years, Plaintiff's website said that Defendant was the designer of the Outlaw, but later, the website changed to state that Defendant was the co-designer. She stated that in 2018, Plaintiff's website said that Defendant had nothing to do with the Outlaw and that Plaintiff was the sole owner and designer of the Outlaw. She stated that Defendant was very angry when Plaintiff removed his name from the website.

Ms. Schmidt testified that Plaintiff wrote on Facebook that he was going to go after Ms. Schmidt's house. She stated that the lawsuit has caused the Trumpet of the Lord's ministry to close and Defendant's counseling business to close. Ms. Schmidt states that Defendant cannot find a job and that his daughter will not have anything to do with him because of the lawsuit. She testified that the lawsuit has put a strain on their marriage.

Ms. Schmidt stated that she heard all the conversations between Plaintiff and Defendant. She said that Defendant designed the Outlaw and that Defendant has the Outlaw name since 1982. Ms. Schmidt stated that she filed for a trademark with respect to the Outlaw and that she asked Plaintiff to stop selling the mouthpiece using the Outlaw name.

On cross examination, Ms. Schmidt testified that she filed the trademark application for the Outlaw after Plaintiff had filed his lawsuit. She stated that the application for the trademark is still pending. She stated that she was privy to most of the conversations between the parties. Ms.

16

Schmidt testified that she is not a trumpet player or a brass instrument player and that she has never designed a mouthpiece. She stated that she saw the hand drawings Defendant made of the Outlaw.

On re-direct examination, Ms. Schmidt testified that Defendant looked at the Bob Reeves mouthpiece when he designed the Outlaw. Ms. Schmidt stated that Defendant asked her to mail the drawings to Plaintiff so that Plaintiff could mail the Outlaw to Pickett Brass to have it made.

On re-cross examination, Ms. Schmidt acknowledged that she was not aware of whether Defendant's drawings were incorporated into the Outlaw.

**F.       Testimony of Defendant Schmidt**

Defendant testified that he designed all the parts of the Outlaw mouthpiece, except the backbore, which Plaintiff designed. Defendant stated that he never said he was the co-designer of the Outlaw because he was the designer. He testified that the parties did not discuss money with respect to selling the Outlaw.

Defendant testified that he became the target of a Facebook group after reporting that the organization had engaged in unsafe and illegal activities. Defendant stated that the same group contacted Plaintiff in order to destroy Defendant. Defendant stated that Plaintiff is lying and slandering him. Defendant stated that when he contacted Plaintiff's Church, he was never able to speak with the anyone with whom he needed to speak. Defendant stated that Plaintiff called him a "Howdy Ho" on Facebook and that Plaintiff wrote a bad review about Defendant's counseling services on Yelp, even though Plaintiff was never a client. Defendant believes that Plaintiff is using the Court to violate his civil rights.

On cross examination, Defendant testified that there were many negative posts on his Yelp page, including Plaintiff's post, but Yelp removed them because they were fake posts. Defendant testified that Plaintiff stated that he was going to go after Defendant's wife's house. Defendant

Case 3:19-cv-00487-JPM-DCP   Document 65   Filed 10/30/20   Page 17 of 40   PageID #: 679

stated that he no longer has his hand drawings of the Outlaw because he sent them to Plaintiff who admitted that they were destroyed. He stated that he does not have a copy of the specifications he sent to Plaintiff.

Defendant acknowledged that he left the voicemails on Plaintiff's telephone that were played for the Court during the July 27 hearing. Defendant also testified that he called ORNL's 800 number and asked for a supervisor but never spoke with one. Defendant stated that he was not a member of ORNL. Defendant testified that he also called Plaintiff's Church to talk with the senior pastor. Defendant also posted on the Church's Yelp page that it did not follow the book of Matthew because the Church would not talk to Defendant.

Defendant testified that he called Plaintiff a liar, a thief, and a crook and that he also called Plaintiff dishonest. Defendant stated that he has used those terms to describe Plaintiff for the last year. Defendant stated that Plaintiff was being dishonest when Plaintiff states that he (Plaintiff) designed the Outlaw.

## III.    POSITIONS OF THE PARTIES

Plaintiff moves [Docs. 36] the Court, pursuant to Federal Rule of Civil Procedure 65, to issue a preliminary injunction against Defendant. The Motion states that after defense counsel withdrew from this matter, Defendant began a renewed, incendiary campaign of defamatory activities on social media directed at Plaintiff, Plaintiff's employer, and Pickett Brass. The Motion submits that Defendant has no basis, business need, or other legitimate justification to make such negative comments on social media regarding Plaintiff, ORNL, Pickett Brass, the Church, or members of Plaintiff's family. The Motion states that a preliminary injunction will not unduly harm Defendants or cause them damages. The Motion states that to permit Defendant's conduct to continue will likely cause immediate and continuing irreparable harm to Plaintiff. Specifically,

18

Plaintiff requests "that a preliminary injunction issue against the Defendants barring them from making any public comments about this litigation, the Plaintiff, his business Legends Brass, ORNL Federal Credit Union, Pickett Brass, Pickett-Blackburn Brass, First Baptist Church of Lenoir City, or any members of the Plaintiff's family." [*Id.* at 3]. Plaintiff states that he is prepared to post a cash bond as required by Rule 65(c) and suggests a bond in the amount of $250. In support of his Motion, Plaintiff filed his Affidavit [Doc. 36-1].

Plaintiff also filed a Supplement to Motion for Preliminary Injunction [Doc. 39], stating that Defendant has continued posting about Plaintiff in an unrelenting fashion. Plaintiff states that Defendant refers to him as the "ORNL Federal Credit Union Vice President." Plaintiff states that ORNL is not involved in this dispute. Plaintiff states that Defendant is also publishing the telephone numbers of Plaintiff, ORNL, and the Church and inciting readers of his social media posts to call and harass Plaintiff, ORNL, and the Church. Plaintiff states that such conduct will cause him irreparable harm. In support of his request, Plaintiff filed another Affidavit. [Doc. 39-1]. In addition, he included a proposed order, stating as follows:

> Accordingly, it is, therefore ORDERED, ADJUDGED AND DECREED that the Defendants, jointly and severally, are hereby enjoined and restrained from making any further public statements or comments, including without limitation to social media, newspapers, newsletters, magazines or any type of periodical, whether print based or internet based regarding the Plaintiff, his employer, ORNL Federal Credit Union, First Baptist Church of Lenoir City, or Legends Brass. The Defendants are further enjoined and restrained from requesting that any third persons or parties repeat, author or proliferate any such information or comments on behalf of the Defendants with respect to Plaintiff, ORNL Federal Credit Union, First Baptist Church of Lenoir City, or Legends Brass. The Defendants shall not request, suggest or incite any third persons or parties to call, email, direct mail or make any other contact with the Plaintiff, ORNL Federal Credit Union, First Baptist Church of Lenoir City, or Legends Brass regarding any matter relating to the dispute which is the subject of this litigation. Unless otherwise

modified or amended by Order of this Court, this preliminary injunction shall continue until the trial of this case.

[Doc. 39-2 at 2–3].

In response to the above filings, Defendant filed a Motion of Con[t]esting Preliminary Injunction [Doc. 42]. Defendant states that he will provide irrefutable evidence that Plaintiff has lied about him. Defendant denies that he has engaged in a pattern of libelous and slanderous activities. Defendant claims that Plaintiff is not entitled to recover damages and that Defendant should recover damages due to the many libelous statements that Plaintiff made on social media about Defendant. Defendant states that he has evidence that Plaintiff is a liar and that Plaintiff has been dishonest on social media and in his filings with the Court. Defendant argues that Plaintiff is attempting to limit his First Amendment right to free speech. Further, Defendant argues that Plaintiff attempted to harm him by announcing on social media that Plaintiff intended to make a "Howdy Ho" mouthpiece. Defendant claims that he told the truth about Plaintiff. In addition, Defendant claims that Plaintiff wrote on Plaintiff's website that the Outlaw was co-designed by Defendant.

Further, Defendant states that Plaintiff regularly publishes his home address online and that Plaintiff has a history of posting his home telephone number. Defendant maintains that Plaintiff is lying when he denies that the Outlaw was not co-designed by Defendant. Defendant requests that the Court deny the preliminary injunction. The Court notes that Defendant submitted several documents with his Motion. [Doc. 42-1 at 1–22].

Plaintiff responds [Doc. 48] that while Defendant claims he can make the alleged defamatory statements under the guise of free speech, Plaintiff is not a public figure or public official. Plaintiff argues that Defendant makes evidentiary statements in his Response that are irrelevant for purpose of the instant Motions and should be disregarded under Rules 401 and 403

of the Federal Rules of Evidence. In addition, Plaintiff asserts that the pages Defendant attached to the Motion [Doc. 42-1 at 1-22] lack a proper foundation, and therefore, are inadmissible under Rule 802. Plaintiff requests that the Court overrule Defendant's Motion and that the Court strike [Doc. 42-1].[22]

In Plaintiff's supplemental post-hearing brief [Doc. 62], he asserts that Defendant's statements concerning Plaintiff being a "dishonest Christian," a "thief," and a "liar" are defamatory on their face and can only be reasonably understood in a defamatory sense. He further maintains that a preliminary injunction will "save him from further irreparable injury," with respect to his employment as a financial officer as well as his position of leadership at his church. [*Id.* at 9]. Plaintiff argues that the issuance of a preliminary injunction would not cause substantial harm to others, but rather would prevent harm to third parties such as ORNL and the Church. Plaintiff's states that the public interest would be served in preventing Defendant from continuing to damage Plaintiff's reputation. [*Id.* at 10]. Finally, Plaintiff argues that the Court's granting of pauper status to Defendant indicates that economic damages would be insufficient to compensate Plaintiff for his losses. [*Id.* at 10–11].

---

[22] The Federal Rules of Evidence do not apply at preliminary injunction hearings generally. *Damon's Restaurants, Inc. v. Eileen K Inc.,* 461 F. Supp. 2d 607, 620 (S.D. Ohio 2006) (noting that while the Sixth Circuit has not explicitly stated whether hearsay evidence may be considered in the context of a preliminary injunction hearing, other district courts within this circuit as well as other circuit courts have considered such evidence) (internal citations omitted); *see, e.g.*, *Fidelity Brokerage Servs. LLC v. Clemens*, No. 2:13-CV-239, 2013 WL 5936671, at *5 (E.D. Tenn. Nov. 4, 2013) ("Generally speaking, district courts within this circuit have not required stringent adherence to rules of evidence when reviewing petitions for injunctive relief[.]") (internal citations omitted)). Accordingly, the Court declines to strike [Doc. 42-1].

Turning to Defendant's post-hearing brief [Doc. 63], the Court notes at the outset that Defendant's brief [Doc. 63] is fifty-two (52) pages[23] in length consisting of the following: [*Id.* at pp. 1–23] argument; [*Id.* at pp. 24–27] purported case law citations; [*Id.* at pp. 29–40] *Exhibit A* containing further argument; [*Id.* at pp. 41–50] additional exhibits labeled A–G depicting purported captured images from legendsbrass.com, various email exchanges with Plaintiff, postings from drumcorpsplanet.com, an image from yahoo mail, and several images from trumpetofthelord.com; and [*Id.* at p. 51] a "Notice to Dismiss Case" requesting the Court to dismiss the case and award Defendant $5,344.75 in legal fees. Local Rule 7.1 limits briefs to 25 pages, absent court permission to file a longer brief based upon a showing of good cause. Here, Defendant failed to request the Court's permission to exceed the 25-page limitation; however, Plaintiff did not file a Motion to Strike,[24] and in reviewing the entire filing, the Court found that Defendant restated the same arguments several times over.

"[A] district court has broad discretion to manage its docket," including by striking a filing before the Court not in accordance with the Local Rules. *ACLU of Kentucky v. McCreary Cty.*, 607 F.3d 439, 451 (6th Cir. 2010) (holding that "based on the district court's power to manage its own docket, the court had ample discretion to strike Defendants' late renewed motion for summary judgment"); *see also Martinez v. United States*, 865 F.3d 842, 844 (6th Cir. 2017) (affirming district court's order striking memorandum exceeding the 20-page limit set forth in local rule). Under this broad discretion, the Court has considered the initial twenty-three pages

---

[23] There are several blank and partially blank pages interspersed among the 52 total pages of Defendant's post-hearing brief.

[24] Plaintiff filed a response to Defendant's post-hearing brief, titled "Response to Motion to Dismiss Case" [Doc. 64], discussed more fully herein, requesting that to the extent Defendant's request is construed as a Motion to Dismiss or Motion for Summary Judgment, it be stricken, or in the alternative that Plaintiff be permitted to file complete response once the Stay Order is lifted.

of Defendant's filing and parsed the portions it deems relevant to resolution of the instant motion, while also reviewing the remaining portions of Defendant's brief after which he exceeded the allowable page limit. The Court reminds Defendant that although he is proceeding pro se, he remains obligated to comply with both the Local Rules and the Federal Rules of Civil Procedure. *See Clapper v. Clark Dev., Inc.*, No. 14-3500, 2015 WL 13688415, at *3 (6th Cir. Apr. 29, 2015) ("Pro se litigants must comply with the procedural rules that govern civil cases."); *Whitfield v. Snyder,* 263 F. App'x 518, 521 (7th Cir. 2008) ("Although district courts may liberally construe the federal and local rules for pro se litigants, even pro se litigants are obligated to follow these rules."). Therefore, Defendant is directed to the applicable page limits set forth in the Local Rules, and instructed that the Court will not consider any future filings that do not comply with the Local Rules to the extent they exceed the applicable page limit. *See, e.g., McCoy v. SC Tiger Manor, LLC*, No. CV 19-723-JWD-SDJ, 2020 WL 5549153, at *5 (M.D. La. Sept. 16, 2020) ("In the future, pleadings that do not adhere to the page limits set forth in the Local Rules, or for which leave of Court to exceed those limits has not been granted, will not be allowed."); *Humphrey v. Rav Investigative & Sec. Servs. Ltd.*, 169 F. Supp. 3d 489, 492 (S.D.N.Y. 2016) (noting pro se plaintiff's failure to comply with page limitation requirements and stating that "[a]ny future submissions exceeding the page-limit requirements will be rejected.").[25]

---

[25] Prior to filing his post-hearing brief [Doc. 63], Defendant sent an email to chambers on September 5, 2020, wherein he attempted to provide a Google Drive link to certain documents. The Court will not consider Defendant's email for any purpose because the transmission of an email to chambers is not an appropriate filing procedure. Defendant has demonstrated through previous filings that he is fully capable of using the Court's Case Management/Electronic Case Filing (CM/ECF) system, and therefore, the Court **ADMONISHES** Defendant that he is only to use CM/ECF for future filings, unless he demonstrates good cause to file and serve documents manually with the Clerk's Office.

Defendant argues in his post-hearing brief that he has not lied about, slandered, or defamed Plaintiff and that Plaintiff's Motion seeks to "deny the Defendant his first amendment rights to free speech." [Doc. 63 at 1]. Defendant asks that Plaintiff's request for a preliminary injunction banning him from contacting the Church and ORNL be denied because Plaintiff is engaging in similar conduct in interfering with Defendant's counseling business and church relations. [*Id.* at 6]. Further, Defendant asserts that the request should be denied and that "[t]his case should be dropped immediately for being unmitigated unfounded harassment of the defendant" because Plaintiff admitted that he lied about who designed the Outlaw. [*Id.*]. Defendant maintains that "a gag order … would unfairly stop the defendant from being able to openly and honestly go the press and tell the people of Tennessee and Georgia the truth about who designed the OUTLAW trumpet mouthpiece." [*Id.* at 21–22]. Defendant asks for the Court to consider Plaintiff's request in four applicable areas: 1) whether Defendant may speak to Plaintiff's employer; 2) whether Defendant may speak with the Church, including Reverend Huff; 3) whether Defendant may speak with the press; and 4) whether Defendant may continue to be allowed to speak about this case on the Internet and other various social media outlets. [*Id.* at 21].[26]

Lastly, Defendant asserts that he was harmed by Plaintiff's libel and seeks $5,344.75 in damages for fees charged by his former attorney, Jeffrey Sliz [*Id.* at 38], and he asks for summary judgment to be entered against Plaintiff, asserting that he has "disproved" the necessary elements. [*Id.* at 40]. However, this case is currently stayed pending resolution of Plaintiff's instant Motion

---

[26] With respect to Defendant's request for clarification, such a request is more appropriately addressed after the final adjudication in this case. Additionally, Defendant requests for the Court to order the United States Marshals Service to arrest certain individuals who threatened to shoot him. [*Id.* at 22]. However, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Jackson v. Hardin Cty. Drug Task Force DEA*, No. 3:18CV-P88-CRS, 2018 WL 1613782, at *3 (W.D. Ky. Apr. 3, 2018) (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

24

for Preliminary Injunction [Doc. 38], and the Court finds that in addition to the above-requested relief being inappropriate at this stage of the case, Defendant has failed to demonstrate any entitlement to monetary damages or summary judgment against Plaintiff at this time.

As previously noted, Plaintiff filed a response to Defendant's post-hearing brief limited to addressing Defendant's request that the case be dismissed. [*See infra* footnote twenty-four]. The Court has admonished Defendant that he must comply with the procedural rules that govern civil cases, and accordingly, the Court **RECOMMENDS** that **[Doc. 63 at 51]** be **STRICKEN** as an improperly filed motion.

## IV. ANALYSIS

Before turning to the merits of the present matter, the Court must address Defendant's behavior during the July 24 hearing.[27]  During court proceedings, the Court expects a certain decorum from the parties.  In fact, Local Rule 83.3 mandates certain behaviors.  During the July 24 hearing, Defendant's behavior was inappropriate and unacceptable.  For instance, Defendant began the July 24 hearing by directing inappropriate questions to the undersigned.  Further, Defendant objected to testimony several times by yelling, "Objection, bullshi*t," and he often interrupted testimony by making arguments, calling Plaintiff a liar, and stating that "this" was a waste of his time. The Court had to take several recesses in order for Defendant to regain his composure and ultimately had to continue the hearing given that the interruptions took more time than the Court had allotted for the hearing.

 Further, not only was Defendant's behavior unacceptable, he was also not respectful.  At one point, it appeared that he left the room during Plaintiff's testimony.  Later, he was seen eating

---

[27] The Court notes that while Defendant continued to ask improper questions of his witnesses, despite the Court's repeated instructions not to do so, Defendant's behavior during the August 13 was an improvement from the July 24 hearing.

a popsicle during the hearing. The Court notes that, at the request of Defendant, the Court changed the hearing from an in-person hearing to a hearing via video conferencing. During hearings via video conferencing, the Court expects the parties to behave as though they are present in the courtroom. Defendant did not meet the Court's expectations during the July 24 hearing. While the undersigned understands that lawsuits can bring about strong emotions, this is not an excuse for Defendant's behavior during court proceedings. The Court hereby **ADMONISHES** Defendant that future conduct of this magnitude may lead the Court to find him in contempt.

The Court will now turn to the merits of Plaintiff's Motions. As stated above, Plaintiff moves pursuant to Rule 65 for a preliminary injunction against Defendant, barring him from making any public comments about this litigation, Plaintiff, Legends Brass, ORNL, Pickett Brass, Pickett-Blackburn Brass, the Church, or any other members of Plaintiff's family. Plaintiff contends that a preliminary injunction is justified because of the need to protect his business and reputation as well as "innocent third parties such as ORNL and the Church." [Doc. 62 at 10]. While acknowledging Defendant's assertion of his First Amendment right, Plaintiff maintains that the defamatory statements published by Defendant are not mere opinions over a business dispute concerning the Outlaw mouthpiece, but libel *per se* in that the words are defamatory on their face. In Plaintiff's Supplemental Motion, he includes a proposed order, adding that Defendant be "enjoined and restrained from requesting that any third persons or parties repeat, author, or proliferate any such information or comments on behalf of the Defendants with respect to Plaintiff, ORNL Federal Credit Union, First Baptist Church of Lenoir City, or Legends Brass." [Doc. 39-2 at 2]. In addition, the proposed order adds the following language, "The Defendants shall not request, suggest or incite any third persons or parties to call, email, direct mail or make any other contact with the Plaintiff, ORNL Federal Credit Union, First Baptist Church of Lenoir City, or

26

Legends Brass regarding any matter relating to the dispute which is the subject of this litigation."
[*Id.*].

The Court will first address the standard of review with respect to a request for a preliminary injunction and then turn to the facts in this case.

## A.     Standard of Review

Courts have explained that "[a] preliminary injunction 'is an extraordinary remedy never awarded as a matter of right." *Thompson v. Hayes,* 748 F. Supp. 2d 824, 830 (E.D. Tenn. 2010) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 (2008) (other citations omitted)). A preliminary injunction "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.* (quoting *Overstreet v. Lexington–Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002) (other citation omitted)). In determining whether a request for a preliminary injunction should be granted, the Court considers the following factors:

> (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the injunction; and (4) whether the movant has demonstrated a strong likelihood of success on the merits as to each claim.

*Id.* (citing O*verstreet,* 305 F.3d at 573). "No single factor is dispositive, but a finding that there is no likelihood of irreparable harm or no likelihood of success on the merits is often fatal." *Id.* (internal citations omitted).

In the present matter, Plaintiff has requested that the Court issue a preliminary injunction preventing Defendant from making certain statements, which implicates the First Amendment. Because the Court must consider the rights under the First Amendment, "the factors for granting

a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Id.* at 381 (quoting *Cnty. Sec. Agency v. The Ohio Dep't of Com.,* 296 F.3d 477, 485 (6th Cir. 2002)). As the Sixth Circuit has explained, when considering a preliminary injunction "[i]n a case of a prior restraint on pure speech, the hurdle is substantially higher: a publication must threaten an interest more fundamental that the First Amendment itself." *Cnty. Sec. Agency,* 296 F.3d at 485 (quoting *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996)). Further, the Sixth Circuit has explained that in such cases "the standard of review is different." *Id.* (quoting *Procter & Gamble Co.*, 78 F.3d at 227).

"'Any system of prior restraints of expression [bears] a heavy presumption against its constitutional validity,' and a party who seeks to have such a restraint upheld 'thus carries a heavy burden of showing justification for the imposition of such a restraint.'" *Id.* (quoting *New York Times Co. v. United States,* 403 U.S. 713, 714, (1971) (per curiam) (citations omitted)). "A prior restraint is permissible if the restrained speech poses 'a grave threat to a critical government interest or to a constitutional right.'" *Id.* (quoting *Procter & Gamble,* 78 F.3d at 225, 227).

Guided by the foregoing, the Court now turns to the present matter.

## B.  Findings

Plaintiff seeks a preliminary injunction to enjoin Defendant from "making any public comments about this litigation, the Plaintiff, his business Legends Brass, ORNL Federal Credit Union, Pickett Brass, Pickett-Blackburn Brass, First Baptist Church of Lenoir City, or any members of the Plaintiff's family." [Doc. 36 at 3]. Plaintiff argues Defendant's "relentless campaign of defamation" has harmed his reputation and his business interests. [Doc. 62 at 9]. Plaintiff also claims that the injunction will prevent harm to nonparties ORNL and the Church.

Plaintiff asserts that Defendant's statements are defamatory *per se* and encourages the Court to adopt what he refers to as a "modern approach" allowing an injunction against false speech.  [*Id.* at 11].

While recognizing that a "modern rule" has developed carving out "a narrow and limited injunction" as an exception to the long-standing, traditional rule that  "equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages," the Court finds that such modern rule does not apply in this instance.  Plaintiff's reliance on *Lothschuetz v. Carpenter*, 893 F.2d 1200 (6th Cir. 1990) and *Loden v. Schmidt*, No. M2014-1284-COA-R3-CV, 2015 WL 1881240 (Tenn. Ct. App. Apr. 24, 2015) in support of his request for a preliminary injunction is misplaced, because neither *Lothschuetz* nor *Loden* addressed the issue of whether a preliminary injunction should issue, but rather whether a permanent injunction should issue after false speech had been determined.

In *Lothschuetz*, the plaintiffs filed a defamation and malicious prosecution action against the defendants.  898 F.2d at 1203.  After the repeated failure of defendants to respond to discovery requests, the trial court eventually entered a default judgment against the defendants on the issue of liability.  *Id.* at 1204.  The default resulted in the allegations of false and defamatory statements being admitted as if a trial on the merits had been conducted.  *Id.*  While the trial court refused to grant the plaintiff's request for a permanent injunction preventing the defendants from continuing their defamatory statements, concluding that such an injunction was an impermissible prior restraint on speech, the United States Court of Appeals for the Sixth Circuit reversed.  The Sixth Circuit found that because of the defendants' continuing defamation of the plaintiffs, a permanent injunction preventing the defendants from making "statements which have been found in this and prior proceedings to be false and libelous" was appropriate.  *Id.* at 1208–09 (Wellford, J., majority

opinion as to injunctive relief, concurring in part and dissenting in part); *see also Renoir-Large v. Lane*, No. 2:11-CV-0023, 2011 WL 3667424, at *3 (S.D. Ohio July 20, 2011), *report and recommendation adopted by*, 2011 WL 3678177 (S.D. Ohio Aug. 22, 2011) ("While the United States Court of Appeals for the Sixth Circuit has authorized a limited injunction prohibiting an individual 'from continuing and reiterating the same libelous and defamatory' statements in accordance with a more modern rule, that Court specifically 'limit[ed] the application of such injunction to the statements which have been found in . . . proceedings to be false and libelous.'") (internal citations from *Lothschuetz* omitted).

Similarly, in *Loden*, the trial court entered a default judgment against the defendant due to his repeated discovery violations. The entry of the default judgment resulted in an adjudication that the defendant made repeated false and defamatory statements as if a trial on the merits had been conducted. Therefore, the court concluded that the requirement that an injunction be entered only after a determination that the speech is, in fact, false had been met, and "as such, the prior restraint on Mr. Schmidt's speech is not impermissible." *Loden*, 2015 WL 1881240 at *9.

It is clear that where this "modern rule" has been followed, there has been an adjudication of the merits before a permanent injunction has issued, and the judge or jury has made a final determination that the statements to be enjoined are false and libelous. *See, e.g.*, *Williams v. Rigg*, 458 F. Supp. 3d 468, 478 (S.D. W. Va. 2020) ("Thus, the majority rule first requires a finding on the merits that such speech is unprotected before an injunction can be issued enjoining further speech. Otherwise, the injunction runs afoul of the First Amendment and constitutes a prior restraint on what might otherwise be lawful speech."); *Goodson v. Republican State Leadership Comm. – Judicial Fairness Initiative*, No. 4:18-CV-791-BSM, 2018 WL 643082, at *3 (E.D. Ark. Nov. 1, 2018) ("It appears wholly unprecedented, however, for a federal court to enter a

30

*preliminary* injunction in a defamation case.  In those defamation cases upholding the constitutionality of restraints on future speech, the injunctions were entered *after* the claims were adjudicated on the merits, and the injunctions were limited to the speech that was *actually found* to be defamatory by the fact-finder.") (citing *Lothschuetz*, 898 F.2d at 1208–09 (Wellford, J., for the court in part)).

"In essence, Plaintiff seeks to bar further speech before a final adjudication on the merits concludes that the speech is unprotected."  *See Williams*, 458 F. Supp. 3d at 480.  In *Williams*, the Southern District of West Virginia addressed an analogous motion for a preliminary injunction brought by a military veteran (Williams), who had received a Congressional Medal of Honor, against the author (Rigg) with whom he allegedly collaborated with to write his biography, seeking to enjoin the defendant from selling the book.  Although the plaintiff in *Williams* was a public figure, thus necessitating a different standard for defamation, the Southern District of West Virginia stated that "ruling on this preliminary injunction request would require this Court to pass judgment on the falsity of Rigg's speech and the potential damage this speech may cause to Williams' reputation," and found that the "requested relief constitutes a direct encroachment upon the rights and guarantees embodies in the First Amendment of the United States Constitution." *Id.* at 480.

Here, even if the Court were to ultimately apply the modern rule permitting injunctions against defamation, Plaintiff has failed to establish that he is entitled to a preliminary injunction. First, at this stage of the proceedings, there has not been a final determination that any statements made by Defendant are false and defamatory, and the Court declines to make such a finding at this time.  *See Am. Univ. of Antigua Coll. of Med. v. Woodward*, No. CIV. 10-10978, 2010 WL 5185075, at *3 (E.D. Mich. Dec. 16, 2010) ("Where this 'modern rule' has been followed, there

31

has been a full adjudication of the merits before an injunction has issued and the judge or jury has made a final determination that the statements to be enjoined are false and libelous."). Similar to *Williams*, "the harm Plaintiff seeks to prevent with this injunction is based entirely on defamation, libel, and reputation–based damages. Thus, granting a preliminary injunction on this basis would require this Court to evaluate [Defendant's] speech and, at a minimum, pass judgment on the truth or falsity of that speech and its potential for harm." 458 F. Supp. 3d at 479.

Second, even if this Court later determines after such adjudication that an injunction is appropriate, Plaintiffs' requested relief is overly broad, extending well beyond the allegedly defamatory statements posted by Defendant. Plaintiff seeks to prohibit Defendant, as well as any third-parties acting on Defendant's behalf, from making any public statements regarding Plaintiff, his employer, the Church, or Legends Brass. Any injunction that may issue would have to be limited in scope to the statements found to be false and libelous. *Renoir-Large v. Lane*, No. 2:11-CV-0023, 2011 WL 3667424, at *4 (S.D. Ohio July 20, 2011), *report and recommendation adopted by*, 2011 WL 3678177 (S.D. Ohio Aug. 22, 2011). Accordingly, even assuming that Plaintiff could demonstrate a likelihood of success with respect to his claims and that the other applicable factors favor Plaintiff, the issuance of an injunction—at least prior to a full adjudication of the merits—is not an appropriate form of relief at this juncture.

In support of Plaintiff's showing that he is likely to succeed on the merits of his claim, Plaintiff asserts that Defendant's statements "calling Plaintiff a crook, a thief and a dishonest Christian should be considered by the Court as libel *per se* in that the words are defamatory on their face." [Doc. 62 at 10]. Libel *per se* as distinguished from libel *per quod* used to be relevant under Tennessee law mainly when it came to pleading for damages. Historically, defamations were classified as either actionable *per se* or *per quod*. Any libel that was defamatory on its face,

32

i.e., apparent from the words themselves, was deemed actionable *per se*, and actual injury was conclusively presumed. On the other hand, any libel that was defamatory only in light of certain extrinsic facts was considered actionable *per quod*, and special damages were required to be pled and proved. *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 418–19 (Tenn. 1978). This distinction became meaningless following the United States Supreme Court's decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), which held that presumed damages were no longer permissible. Now, "[i]n libel actions, the burden of proof rests upon the plaintiff to show defamation and prove damages. He need not show, however, that the statement is false. There is a legal presumption of falsity which the defendant may rebut by proving truth as a defense." *Id*. at 420.

Here, Plaintiff sets out three allegedly defamatory statements made by Defendant, i.e., calling Plaintiff a crook, a thief and a dishonest Christian."[28] In order to be actionable, Defendant's statements "must involve fact and not a matter of simple opinion." *Seaton v. TripAdvisor, LLC*, No. 3:11-CV-549, 2012 WL 3637394, at *4 (E.D. Tenn. Aug. 22, 2012), *aff'd*, 728 F.3d 592 (6th Cir. 2013) (internal citations omitted); *see also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990). "[S]tatements of pure opinion, hyperbole, or rhetorical exaggeration will receive First Amendment protection." *Ogle v. Hocker,* 279 F. App'x 391, 397 (6th Cir. 2008) (citing *Jolliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th Cir. 2008)). The Sixth Circuit has fashioned a framework for ascertaining whether a defamatory meaning can be gleaned from allegedly defamatory statements using a multi-factor test:

> (1) The common usage or meaning of the allegedly defamatory words themselves, whether they are commonly understood to be loose, figurative, or hyperbolic words;

---

[28] During the hearing, Plaintiff testified that Defendant called him a criminal [Doc. 59 at 32]; however, on cross examination, Plaintiff acknowledged that Defendant had never called Plaintiff a "criminal," but stated, "crooked and dishonest, [] implies criminal." *Id*. at 63.

33

      (2)   The degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof;

      (3)   The immediate context in which the statement occurs; and

      (4)   The broader social context into which the statement fits.

*Ogle*, 279 F. App'x at 397. It will be up to the trier of fact to weigh these factors together and determine whether to attribute a defamatory meaning to Defendant's statements. While Plaintiff could ultimately prevail on his claims, on the record currently before the Court, Plaintiff has not satisfied the first prong of the preliminary injunction test in making a clear showing that he is likely to succeed at trial.

      The Sixth Circuit has stated that "in the First Amendment context, the other factors [involved in analyzing a request for a preliminary injunction] are essentially encompassed by the analysis of the movant's likelihood of success on the merits." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 890 (6th Cir. 2012); *see, e.g.*, *His Healing Hands Church v. Lansing Hous. Comm'n*, 160 F. Supp. 3d 1014, 1018 (W.D. Mich. 2016). However, the Court will also briefly address the remaining factors as argued by the parties.

      With respect to the second prong of the preliminary injunction test, Plaintiff has also failed to show a likelihood of suffering irreparable harm and inadequacy of legal remedies. Plaintiff asserts that damage to his professional reputation as the ORNL Senior Vice President Chief Lending Officer and as a deacon and trustee at the Church might afford a basis for a finding of irreparable injury. At the hearing Plaintiff testified that he felt Defendant's statements could impact his career in that if he wanted to advance in his career, the next step in would be as chief lending officer, and "the minute the HR Department Google search me, that's all they would see is all this defamation." [Doc. 59 at 42]. Further, Ms. Pettus testified in general terms that Defendant's contacts with ORNL concerning Plaintiff have "not been good" for Plaintiff. [*Id.* at

34

16–17].  Regarding his role of deacon and trustee at the Church, Plaintiff testified that "obviously those are two positions that you can't have this kind of person as Mr. Schmidt's claiming of me in those roles."  [*Id.* at 42].

To constitute irreparable harm, an injury must be certain, great, and actual.  *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (citing *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985)).  While Plaintiff contends that Defendant's statements are injurious to his reputation, "a mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction."  *Lucero*, 160 F. Supp. 2d at 801 (quoting *Borey v. Nat'l Union Fire Ins.,* 934 F.2d 30, 34 (2d Cir. 1991)); *see also Regan v. Vinick & Young,* 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction").  While Plaintiff speculates as to the perceived damage to his reputation and the possible impact Defendant's statements might have on his career and his position at the Church, he presented no evidence that the alleged harms are likely to materialize.  Pettus's general statement that Defendant's contacts with ORNL have not been good for Plaintiff falls short of demonstrating any specific negative impact on Plaintiff's career.  Moreover, Plaintiff presented no evidence that he will likely be subjected to any negative action by the Church in the absence of an injunction.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (holding that a party seeking injunctive relief must show more than a "possibility" of irreparable harm; rather it must show that irreparable injury "is likely in the absence of an injunction"); *see, e.g.*, Lieberman v. Husted, 900 F. Supp. 2d 767, 782 (S.D. Ohio 2012) ("While both Plaintiffs speculated as to the *possible* impact their removal might have on their careers, their families, and their reputations, they presented no evidence that the alleged harms were *likely* to actually materialize.") (emphasis in original).

35

In addition to reputational harm, Plaintiff alleges that Defendant's actions have caused him economic losses, as Plaintiff testified that his business underwent a dramatic decrease in mouthpiece sales. *See* [Doc. 59 at 42–43]. The Court acknowledges that injury to a movant's reputation may not be fully compensable by money damages. *See Doherty v. City of Maryville*, No. 3:07–cv–157, 2009 WL 2823670, at \*4 (E.D. Tenn. Aug. 28, 2009) (internal citations omitted). Nevertheless, "[h]arm that is compensable through monetary damages generally will not justify a preliminary injunction." *King Pharm., Inc. v. Zymogenetics, Inc.*, No. 2:09-CV-244, 2009 WL 4931238, at \*4 (E.D. Tenn. Dec. 10, 2009) (citing *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992)). In the present case, Plaintiff suggests that Defendant's *in forma pauperis* status[29] "likely means that an award of economic damages will not compensate Plaintiff for his loses [sic]." [Doc. 62 at 11]. "[A] risk that a wronged party will not be able to obtain the full measure of damages due to a defendant's insolvency supports a finding that there is no other adequate remedy at law in the absence of injunctive relief." *Ethicon Endo-Surgery, Inc. v. Crescendo Techs., LLC*, No. 1:07-CV-1016, 2009 WL 2707805, at \*7 (S.D. Ohio Aug. 24, 2009).

However, "[w]hether the plaintiff will suffer irreparable harm where it is unable to collect money damages depends on the defendant's resources and the potential magnitude of the damage award after trial." *Advocate Capital, Inc. v. Law Office of A. Clark Cone, P.A.*, No. 3:06-0847, 2006 WL 3469576, at \*4 (M.D. Tenn. Nov. 29, 2006) (quoting *Monfardini v. Quinlan*, No. 02 C 4284, 2003 WL 21384642, at \*3 (N.D. Ill. June 13, 2003)). At this point, Defendant's resources in this case are not established. "Indigency does not mean insolvency . . . [and] a litigant need not

---

[29] The Court granted Plaintiff's application for leave to proceed *in forma pauperis* on July 2, 2020. [Doc. 53].

demonstrate absolute destitution to qualify for *in forma pauperis* status." *United States v. Panyard*, No. 07-20037-2, 2009 WL 10679412, at *2 (E.D. Mich. June 23, 2009) (although addressing the appointment of an attorney pursuant to the Criminal Justice Act) (citing *Lee v. McDonald's Corp.*, 231 F.3d 456, 459 (8th Cir. 2000)) (additional internal citation omitted).

In sum, Plaintiff's claims do not provide a sufficient basis for a finding by the Court that Plaintiff would suffer irreparable damage or that he has no adequate remedy at law in the event the preliminary injunction is denied.

The third factor to be considered is the substantial harm to others if a preliminary injunction were to issue. Plaintiff asserts that the issuance of the preliminary injunction will cause no harm to the public, but "rather it will protect third parties ORNL and Plaintiff's Church from further harassment from [Defendant]." [Doc. 62 at 13]. However, the Court must also consider the potential harm to Defendant that would result from the requested preliminary injunction. Plaintiff acknowledges that Defendant is asserting his First Amendment rights regarding matters of free speech, but as previously discussed, Plaintiff argues that the defamatory statements are libel *per se* such that Defendant has no protectable legal interest in making the statements. The Court has explained its reasoning as to why the statements cannot be considered libel *per se*, and finds that Plaintiff seeks to bar further speech before a final adjudication on the merits determines that the speech is unprotected, which would impinge upon Defendant's First Amendment rights. *See Jones v. Metro Prop. Grp., LLC*, No. 13-11977, 2014 WL 1305142, at *10 (E.D. Mich. Mar. 28, 2014) ("Moreover, notwithstanding the merits of the counter-claim, the alleged harm Counter–Defendant's 'communications have done and will do' to MPG's 'business interests and their reputations' cannot override Counter–Defendants' entitlement to the same right to free speech accorded to their opponent."); *Thompson v. Hayes*, 748 F. Supp. 2d 824, 831 (E.D. Tenn.

2010) ("As defendant correctly explains, plaintiffs' proffered basis for the issuance of injunctive relief to prevent defendant from communicating with cabin owners is the alleged harm these communications have done and will do to plaintiffs' business interests and their reputations. Such interests cannot override defendant's First Amendment rights.") (citing *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419–20 (1971)).

Lastly, the Court must consider whether the public interest would be served if the Court were to grant the preliminary injunction. Plaintiff argues that the public interest is served in preventing Defendant from "continuing to damage the reputation of the Plaintiff and harming innocent third parties such as ORNL and the Church" [Doc. 62 at 10] in order to maintain the status quo until the case can be adjudicated. This general contention by Plaintiff impermissibly presumes that any statements made by Defendant are false and defamatory before a final determination that the speech is, in fact, false. In defamation cases, the public interest against imposing a prior restraint on speech that has not been found defamatory must be taken into account. *Ward v. Triple Canopy, Inc.*, No. 8:17-CV-802–T–24-MAP, 2017 WL 3149431, at *5 (M.D. Fla. July 25, 2017) (recognizing "strong public interest against imposing a prior restraint on speech and issuing a . . . preliminary injunction as to speech that has not yet been found defamatory"); *Walsh v. Enge*, 154 F. Supp. 3d 1113, 1133 n.12 (D. Or. 2015) ("Some courts have been more willing to allow prospective restraints on speech in the context of private speakers threatening to continue to defame other private individuals . . . But even in a context more tolerant of restraints on speech, courts emphasize that silencing future speech is harmful.") (collecting cases); *Oliver v. Skinner*, No. 4:09-CV-29, 2013 WL 667664, at *10 (S.D. Miss. Feb. 22, 2013) ("[T]he public interest is better served by a cautious approach to injunctive relief in defamation cases . . . because 'prior restraints on speech and publication are the most serious and the least tolerable infringement on

38

First Amendment rights[.]'") (quoting *Tory v. Cochran*, 544 U.S. 734, 738 (2005)), *aff'd*, 552 F. App'x 357 (5th Cir. 2014).

"[T]here is a public interest in protecting First Amendment rights." *Thompson v. Hayes*, 748 F. Supp. 2d 824, 833 (E.D. Tenn. 2010); *see, e.g.*, *McCarthy v. Fuller*, 810 F.3d 456, 462–63 (7th Cir. 2015) ("An injunction against speech harms not just the speakers but also the listeners . . . '[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.'") (quoting *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)). Therefore, because there is a public interest in protecting First Amendment rights, the Court finds that the public interest would not be served by the issuance of a preliminary injunction.

Ultimately, Plaintiff has failed to demonstrate that Defendant's speech "poses 'a grave threat to a critical government interest or to a constitutional right,'" such that the imposition of a prior restraint on Defendant's speech through a preliminary injunction is appropriate. *Cnty. Sec. Agency v. The Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002) (quoting *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996)); *see, e.g.*, *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 311 (Ky. 2010) ("Thus, while the rule may temporarily delay relief for those ultimately found to be innocent victims of slander and libel, it prevents the unwarranted suppression of speech of those who are ultimately shown to have committed no defamation, and thereby protects important constitutional values."). While the Court has previously detailed why a preliminary injunction would not be appropriate in this case, in the overall analysis of the preliminary injunction factors to be considered, the Court also finds that they militate against granting Plaintiff's requested relief.

## V. CONCLUSION

Accordingly, for the reasons explained above, the Court **RECOMMENDS**[30] that Plaintiffs' Motions requesting a preliminary injunction [**Docs. 36, 39**] be **DENIED.**[31] The Court further recommends that the portion of Defendant's post-hearing brief requesting that the case be dismissed **[Doc. 63 at 51]** be **STRICKEN** as an improperly filed motion. Finally, the Clerk's Office is **DIRECTED** to correct the docket entry for [Doc. 42] to reflect that the filing is "Defendant's Response to Plaintiff's Motions for Preliminary Injunction."

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[30] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

[31] As noted in footnote 1 *supra*, Defendant's Motion Con[t]esting Preliminary Injunction [Doc. 42] will be construed as a response to Plaintiffs' Motions [Doc. 36, 39] and the Clerk's Office will be directed to correct the docket entry for [Doc. 42].

40